**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Q.M., by and through his parents, M.M.
and T.M., and M.M. and T.M., in their
own right,

Civil Action No.

Plaintiff,

v.

CENTRAL BUCKS SCHOOL
DISTRICT,

Defendant.

**COMPLAINT**

## I. INTRODUCTION

1.      Plaintiffs M.M. and T.M. ("Parents"), individually and on behalf of their son

Q.M. (collectively "Plaintiffs") file this action seeking reversal of a decision and order of a

Pennsylvania Special Education Hearing Officer in the Pennsylvania Office for Dispute

Resolution, in a case arising under the Individuals with Disabilities Education Act ("IDEA").

2.      Q.M. is a special education student with a rare and devastating genetic condition,

Prader-Willi syndrome ("PWS"), which causes insatiable hunger, extreme anxiety and inability

to focus on anything else in the presence of food. Because of this condition, Q.M. requires

residential placement in a food-secure environment in which all staff are trained to address his

genetic condition and no food is allowed in the building in which Q.M. receives his education.

3.      In a previous due process proceeding, the Hearing Officer held that the

Individualized Education Program ("IEP") offered by the Central Bucks School District

("District") in May, 2021 did not offer Q.M. a free, appropriate public education and that the

1

residential school chosen by the Parents was appropriate and necessary. The Hearing Officer ordered the District to reimburse the Parents for most of the cost of Q.M.'s residential placement.

4.     The District appealed to United States District Court, and in an opinion dated September 12, 2023, the Court substantially upheld the Hearing Officer's decision.

5.     On March 25, 2022, while the case in federal court was pending, the District issued a new IEP and Notice of Recommended Educational Placement ("NOREP") for Q.M. The new IEP was substantially similar to the previous IEP offered by the District and would have placed Q.M. at a high school in the District.

6.     After the District Court, on cross-motions for judgment on the record, adjudicated the claims arising from the IEP of May, 2021, No. 2:22-cv-01128-MAK, ECF 37, 38, the Court offered the parties a choice of a trial on the appropriateness of the March 2022 IEP or remand to the Hearing Officer. The parties chose remand. *Id.,* ECF 43.

7.     Upon remand, the Parents filed a new Complaint in the Pennsylvania Office for Dispute Resolution challenging the IEP of March, 2022.

8.     After a due process hearing, the Hearing Officer held, in a decision issued on May 20, 2023, that the 2022 IEP offered Q.M. a free, appropriate public education and that the parents were not entitled to tuition reimbursement. Hearing Officer Decision, ODR No. 27061 22-23 (hereinafter "H.O. Dec.").

9.     The record of the due process hearing establishes that the District's IEP does not offer Q.M. an appropriate education and that Q.M. continues to need residential placement.

## II.   PARTIES

10.     Q.M. is a high school student who enjoys the protections of IDEA as a child with a disability as defined by 34 C.F.R. § 300.8.  He reached the age of 18 in June, 2023. He and his parents and siblings live within the boundaries of the Central Bucks School District.

11.     Q.M. currently attends the Latham School in Brewster, Massachusetts. Because this placement was upheld by a special education due process hearing officer in the previous due process proceeding, it is Q.M.'s current educational placement under IDEA, 20 U.S.C. § 1415(j).

12.     Q.M.'s rare genetic condition, Prader-Willi syndrome, has resulted in significant disabilities.  No party denies that Q.M. is eligible for and entitled to specially designed instruction and related services under IDEA.

13.     The Central Bucks School District is a local educational agency (LEA) under the IDEA, 20 U.S.C. § 1402(19)(A), 34 CFR § 300.28(a). Its offices are located at 20 Welden Drive, Doylestown, PA 18901. It is responsible for providing a free, appropriate public education to all eligible students in the District and for implementing the parental rights and procedural protections of IDEA.

## III.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, conferring jurisdiction in cases arising under the Constitution and laws of the United States, and 28 U.S.C. § 1343, conferring original jurisdiction on district courts to secure relief under any Act of Congress providing for the protection of civil rights.

15.     Plaintiffs have exhausted their administrative remedies under 20 U.S.C. § 1415 of the Individuals with Disabilities Education Act ("IDEA").

**16.**     This appeal is timely filed within 90 days of the Hearing Officer's decision,

pursuant to IDEA, 20 U.S.C. § 1415(i)(2)(B). Pennsylvania does not have a different statute of

limitations in IDEA cases.

## IV.   FACTS.

17.     M.M. and T.M. first filed a due process complaint on behalf of Q.M. in 2021,

ODR No. 24978-20-21, seeking reimbursement for their son's placement at the Latham Centers

in Brewster, Massachusetts, a school specializing in educating students with Prader-Willi

syndrome, and sought reimbursement.

18.     The Hearing Officer issued a decision on January 15, 2022, awarding tuition

reimbursement, discounted by 15%. The District appealed the award of tuition reimbursement to

federal court, the Parents cross-appealed the hearing officer's denial of compensatory education.

*Central Bucks Sch. Dist. v. Q.M.,* No 2:22-cv-01128-MAK (filed March 21, 2022).

19.     While the action in federal court was pending, the District issued the IEP of

March 25, 2022 that is the subject of the present action. On April 30, 2022, the parents filed an

Amended Counterclaim to add claims concerning the appropriateness of the March 25, 2022

No. 2:22-cv-01128-MAK, ECF 38, 39. IEP.

20.     On September 12, 2022, the Court substantially affirmed the Hearing Officer's

decision while adding some additional relief.  No. 2:22-cv-01128-MAK, ECF 38, 39. The court

declined to grant summary judgment on the claims arising from the March 2022 IEP but offered

the parties a choice between a trial on the merits of the District's program for the 2022-23 school

year and remand to the Hearing Officer. The parties stipulated to remand. ECF 40.

21.     On remand, after a conference with the Hearing Officer who had presided over

the first administrative action, the parents filed a new due process complaint. A hearing was held.

The parties and the Hearing Officer agreed that the record of the second proceeding would include the record of the first hearing and the record made in the action in federal court.[1]

22.     The issues in the second complaint were: (1) Whether or not the Individualized Education Program (IEP) offered by the District for the 2022-23 school year was appropriate for Q.M.; (2) If the District's IEP was not appropriate, whether placement at Latham Centers was "proper under the Act"; and (3) whether the parents' actions were unreasonable.[2]

**A.  The District's Proposed IEP Is Inappropriate.**

23.     To meet its obligation under the IDEA, a school district must offer an IEP that is reasonably calculated to enable a child "to make progress appropriate in light of the child's circumstances." *Endrew F.  v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017); 137 S. Ct. at 999.  Those circumstances include the child's "present levels of achievement, disability, and potential for growth." *Endrew F.*, 137 S. Ct. at 999 (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv).

24.     Pursuant to the IDEA, school districts must reimburse parents for unilateral placement if  (1) school officials failed to offer the child a free appropriate public education in a public or private school; (2) the private school placement chosen by the parents was otherwise "proper under the Act"; and (3) the equities weigh in favor of reimbursement—that is, the parents did not otherwise act unreasonably. *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007).

---

[1] As in the previous due process proceeding, Q.M.'s claims arise under the Individuals with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Section 504), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* (ADA).

[2] The paragraphs that follow include citations to the administrative record in the first and second due process proceedings, "N.T. ___" refers to the Notes of Testimony of the due process hearing. "P-__" and "S-__" refer to the exhibits offered by the Parents and the District respectively. Citations to ODR No. 24978-20-21 are prefaced by "2021." Citations to the record of the federal court are prefaced by the docket number and the Electronic Case Filing (ECF) number.

25.     Q.M. needs a Prader-Willi-specific educational environment. As Judge Kearney described it in his decision on the parties' cross-appeals, Prader-Willi is "a rare genetic spectrum disorder creating an insatiable desire for food along with affecting cognitive, physical, emotional, and behavioral functions." *Central Bucks Sch. Dist. v. Q.M.,* No. 2:22-cv-01128-MAK (E.D. Pa.), ECF 38 at 4. PWS is a spectrum condition, and the parents and their experts agree that Q.M. is at the severe end of the spectrum.

26.     At the heart of this case is Q.M.'s need for a food-secure educational environment or total food security, defined as "a system in which food is present only during mealtimes and food is locked up and out of sight at all other times and where, in a school setting, there is no food during instruction, special events or anywhere in the school building except during mealtimes in the cafeteria." *See* No 2:22-cv-01128-MAK, Joint Appendix (hereinafter JA) at 572, 573, 648 (citing authorities).

27.     In Q.M.'s case the need for total food security or a  PWS-specific environment, extends to his residence. In response to interrogatories propounded by the Parents in the previous federal action, the District acknowledged that it cannot provide total food security in its high school buildings. JA at 652.

28.      Persons with PWS at Q.M.'s level of severity are significantly distracted by the presence of food, and even if they are physically prevented from access to food because it is locked up, if they know there is food in the environment, they are unable to engage in learning because they are thinking of food and how to get access to it. N.T. 19, 40-41, 2021 N.T. 423, 459, 489; *see* 2021 N.T. 310.

29.     Persons with PWS have high levels of anxiety and are unable to manage that anxiety, which leads to aggression and poor impulse control. As Judge Kearney found, for

persons with severe PWS, "[s]eeing or smelling food triggers extreme anxiety." Dist. Ct. Op.

ECF 38 at 4. As Patrice Carroll of Latham Centers testified,

> [P]eople with PWS have extremely high levels of anxiety and they're not able to manage that anxiety as a neuro typical person could. And that's when you see the aggression, the impulse control. What science will tell you is that the person with PWS needs a very, very rigid, predictable routine that doesn't have the distraction of food around. …It's if there's food in the cafeteria, if there's food in a teacher's drawer that they know isn't locked, any of those things add to the anxiety of the person with PWS. And in that moment, and in that environment, they're not able to focus. If they're in an environment where there is total food security, where there are other people who understand their syndrome, where they have that exactness in their day, that's when they're able to focus and learn and work on whatever goals they need to work on. Otherwise, they're gonna be hyper-focused on what's next, is the day gonna change, is there food in the third classroom down the hall.

30.     N.T. 105. As Q.M.'s mother T.M. testified, Q.M. is unable to process learning when he is thinking about food, which is "really all of the time" in the absence of total food security.

31.     Like those of many persons with PWS, Q.M.'s symptoms increased in severity when he reached adolescence. N.T. 169.

32.     No cure exists for Prader-Willi syndrome: It is a life-long condition. Q.M. will need to be supported in a PWS-specific residential environment for the rest of his life. His is a residential level of need. N.T. 103-104.

33.     Treatment of PWS is not based on a "recovery model." N.T. 103. The fact that Q.M. has done very well at Latham, a PWS-specific environment, does not mean he is ready to return to a non-PWS specific environment. Rather, taking Q.M. out of such an environment will return him to his previous state. N.T. 105.

34.     Q.M.'s rigidity and resistance to change is seen in his difficulty adjusting to a change in his residential suite and his classroom. Because Q.M. had done to well at Latham after an initially difficult adjustment, the school decided to place greater demands on him "to work a

little harder, to be a little more independent." He did not do well at all, and the school decided to move him back to his original dorm, while keeping him in the more demanding classroom. N.T. 107, 134-35.

35.     The District admitted, during discovery in the federal action, that it cannot provide total food security. No. 2:22-cv-01128-MAK, JA 652. The District Court affirmed the Hearing Officer's finding, based on the record of the 2021 due process hearing, that "the record preponderantly establishes that Student's presentation as of May 2021 could not be met in a District high school for the fall of 2021." Dist. Ct. Op. at 32.

36.     Judge Kearney noted that Hearing Officer Skidmore found Q.M.'s condition had become more severe over time and that by the fall of 2020, both the Parents and District observed behavioral regression. Thus, Q.M.'s needs could no longer be met by the District's IEP. *Id.; see also* Dist. Ct. Op. at 37.

37.     Further, Judge Kearney affirmed the Hearing Officer's holding that the District knew of Q.M.'s increasingly challenging behavior and compulsive desire for food "but lacked the resources and ability to address his severe symptoms" and enable him to progress. *Id.* at 36.

38.     The services addressed to Q.M.'s food-seeking behavior in the IEP of March 22, 2022 are little different from the services proffered in the IEPs of February and May 2021. The services in the 2021 IEPs included:

- One-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management;

- Two scheduled snack times for Q.M. with food brought from home;

- Q.M. to bring food from home for lunches and would not buy anything from the cafeteria;

- Q.M. not to receive any food from school, whether at lunch or special events;

- Q.M.'s IEP team would be trained by the Prader-Willi Syndrome Association (USA)'s Wyatt Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.

Dist. Ct. Op. at 12-13.

39.     The only new item of specially designed instruction addressed to food security in the March 25, 2022 IEP is "Food secure environment (locked cabinets that have food, locked refrigerator) across all *classroom* settings." S-6 at 59 (emphasis added).

40.     Patrice Carroll and Dr. Miller, both experts in PWS, testified that even if the District succeeded in locking up all food in the classroom, and even if it succeeded in preventing students and teachers from bringing snacks and drinks into the classroom, these measures would not provide sufficient food security for Q.M.. If food is present in other classrooms in the building, or if students discard the remains of their food and snacks in trash receptacles in the building, Q.M. will be aware of the presence of food, and it will trigger his insatiable appetite and anxiety.

41.     As Dr. Miller testified, based on her 22 years of experience treating children with severe PWS, children with severe Prader-Willi syndrome, "because they are starving hungry all the time, are like ninjas when it comes to getting food." She has patients who have gone into the teachers' lounge and drunk coffee creamer. "They will literally eat everything," including packets of ketchup, food from the garbage and food on the floor. N.T. 180-82.  She testified that "high school children throw food they don't want into the bathroom garbage cans … and my patients have gone in there and eat[en] food out of the garbage cans." N.T. 181.

42.     The Court found no reason to disturb the Hearing Officer's judgment of the credibility and compelling testimony of Dr. Jennifer Miller, an endocrinologist and leading international expert on Prader-Willi syndrome who has "particularized knowledge" of Q.M. and has treated him for more than ten years that he needed a residential placement. *Id.*

43.     The risks to Q.M. of failing to provide him an environment that provides total food security, are severe. The biggest risk is death by choking due to the tendency, when the person gets access to food, of consuming it as quickly as possible, by swallowing it without chewing, which raises the risk of choking significantly.  Another risk is gastric necrosis, which is happens when the person eats so much, or there is so much undigested food in the stomach, that the stomach bursts. N.T. 185-86. Every year Dr. Miller sees one or two adolescents or young adults die from choking or gastric necrosis from being in a less than ideal food secure environment. *Id.*

44.     The District's solution to the problem of food security throughout the building is that Q.M. would be accompanied and monitored by a 1:1 paraprofessional. But Q.M. had had a 1:1 paraprofessional under his previous IEPs in the District, and that did not prevent him from accessing food inappropriately, as his parents' discovery of food wrappers in his belongings from school and his soaring weight gain to morbid obesity attests. 2021 N.T. 241, 244.

45.     A 1:1 aide is unlikely to keep Q.M. from sneaking food. As Dr. Miller testified, many of the children she works have told her that they will get up to go throw their lunch in the garbage can in the cafeteria, while they are being monitored, and they manage to get food that somebody threw away previously. "They are watching like hawks at all times to see if anything is possibly going to be available …, and if that opportunity presents itself, they will take that opportunity." N.T. 182.

46.     The IEP does not bar people in classrooms near Q.M.'s classrooms from bringing snacks into their classrooms.  And, as Patrice Carroll testified, it can be very difficult for a public school to subordinate the interests of hundreds of students to the rights of one student. N.T. 113. Yet the presence of food in adjoining classrooms would be extremely anxiety inducing, because if the person with Prader-Willi syndrome knows that food is around, they cannot concentrate on anything else other than thinking "how could I get that food?" N.T. 183.

47.     Patrice Carroll testified that during lunch, even if Q.M. brought all his own food from school, he would either have to eat by himself, or the other students in the cafeteria would have to eat the same food as he. N.T. 112.

48.     Dr. Miller's comments about the skill of children with PWS at getting access to food in the blink of an eye, in a moment when no one is looking, echo those of T.M. that "having a completely food secure environment, while it sounds simple and, oh, we can lock it, it's not enough. Because the behavior is so driven around trying to manipulate, [and] Q.M. is a very smart child in the way that he can manipulate to get food." They are consistent with the testimony of M.M. that even in a family of four children, with a regular practice of locking all cabinets and refrigerators and extremely high motivation to keep Q.M. from access to food, it is difficult to prevent him from surreptitiously getting it. N.T. 145-46.

49.     The unrebutted evidence on the record of the second due process hearing establishes that food security means the complete absence of food from the school environment. It is not enough just to control the food intake of the student of concern. If others are consuming drinks or snacks or even chewing gum, a person with PWS will be aware of it, and it will trigger anxiety and an insatiable desire for access to the food.

50.     In an environment that is not food-secure, Q.M. is constantly bothered by the presence of food. He acknowledges that it is always on his mind. 2021 N.T. 129, 253. In this, he is typical of persons with PWS. 2021 N.T. 131, 133, 470. The District's efforts to provide food security have consisted of providing Q.M. with an aide who could control his intake of food, rather than creating an environment where Q.M. could not see or smell food. 2021 N.T. 133.

**B.  Latham Centers is a Proper Placement for Q.M.**

51.     Latham Centers is a school licensed by the Massachusetts Department of Elementary and Secondary Education and nationally accredited by the Council on Accreditation. It is internationally renowned for its expertise and success in working with individuals with PWS. 2021 N.T. 381; in fact, it is the only program in the United States that provides the type of support that students like Q.M. need. 2021 N.T. 522.

52.     Latham provides a curriculum based on the Massachusetts education standards, which in turn are based on the Common Core. 2021 N.T. 404.  Latham has a BCBA and behavior technician on staff as well as four to five other clinicians. 2021 N.T. 388, 399. A psychiatric nurse-practitioner provides psychiatric services. 2021 N.T. 402.

53.     Latham is a food secure environment. There is no food anywhere. No one is allowed to bring food into the school. At lunch students are served their designated diets, planned by a dietician, and combine social skills with eating their meal in a clear routine. Once students learn that there is no way to sneak food, they are able to focus on learning. 2021 N,T. 157-59, 269, 397.

54.     Academic classes at Latham are small and individualized, and after school hours, staff provide instruction in life skills in the residential part of the campus. Students participate in community-based instruction. 2021 N.T. 159-60. Students at Latham soon learn that the demands

placed on them will not change no matter what their behavior. Staff wait them out, do not give into their demands, and continue to expect performance. 2021 N.T. 430.

55.     Q.M. has done very well at Latham. When he was first enrolled, he was extremely agitated, anxious and unsafe. 2021 N.T. 428. He had developed a pattern of creating chaos to get what he wanted. 2021 N.T. 432. Like many students who are unused to the demands of the program, he had a difficult time adjusting at first, but he has matured, developed patience and learned to own his own behavior. 2021 N.T. 266-67, 269, 286, 299, 431.

56.     Faced with the undeniable evidence of Q.M.'s need for a PWS-specific environment, and the inability of the District to provide one, the District's response in the two due process hearings was to attack Latham, seemingly for anything possible, no matter how untrue or irrelevant. The District's targets during the second hearing were transition, lack of discharge planning, "security breaches" and restraint.

57.     **Transition**.  The District attacked Q.M.'s placement at Latham for lack of a transition plan. But the transition section of the District's own IEP is skeletal and for the most part simply repeats the courses and related services it anticipates Q.M. will receive at Central Bucks High School West. The only exception in the Employment section is the statement that Q.M. will practice "Vocational Skills in simulated work experiences within the classroom and school building." As for real work experiences in the community, the IEP states that Q.M. "will access the community with family or agency support."

58.     In other words, the District treated real work experiences for Q.M. as not the school district's responsibility. The IEP states that Q.M. will complete a career interest inventory once a year, a nebulous activity and not an employment outcome.  The Independent Living section merely repeats the courses Q.M. will take, which will not lead to an independent living

outcome, and states that Q.M. will participate in community-based instruction twice a month for an unspecified amount of time.

59.     Q.M. is already doing much more than the above at Latham. He works in a school store, N.T. 92. He takes vocational classes, which include developing a resume. N.T. 124. He works weekly in recycling, maintenance and in an office. N.T. 127. He participates in community-based instruction including seal watches, thanks to Latham's success in establishing a highly PWS-aware community in its part of Cape Cod.

60.     **Discharge**. The District tried during the hearing to fault Latham for not developing a discharge plan for Q.M. to leave Latham for a "less restrictive" setting. It made much of the fact that the "discharge" section of Latham's forms in Q.M.'s records are blank. Since IDEA contains no requirement for "discharge planning," this criticism is irrelevant, unless the District was able to establish that a recovery model must be applied to services for persons with Prader-Willi syndrome, such that any stay in a residential program is presumed to be temporary, even for persons like Q.M. who clearly will require a residential level of care for the rest of their lives. N.T. 87-88. The District offered no such proof.

61.     The District also claimed that Q.M. should have a "step down" goal, as though PWS were a condition that is amenable to rehabilitation. It is not.

62.     **Security Breaches.** This is the term Latham uses for breaches of food security. These events are reported in forms called General Event Reports that also include reports of restraints and holds. *See* S-10. The District made the overheated claim in its questioning of Parent witnesses that Q.M. has eaten more unauthorized food at Latham than he did in the District. This claim is based on S-10, a document of 179 pages documenting incidents, even the most minor, in meticulous detail.

63.     Far from keeping a similarly painstaking record of Q.M.'s ingestion of food he should not have had access to, the District never kept such documentation when Q.M. was a student in the District. It should not benefit from its own inattention to what, for Q.M., is a serious problem.

64.     A total of six incidents of unauthorized possession of food were documented in the Latham records, S-10 at 6, 18, 31, 33, 170. Four of the incident reports appeared to document Q.M.'s keeping the small snack he was given the night before. Two others documented a total of four mints and a small piece of candy. It is far-fetched to claim that these events represent major security breaches.

65.     Q.M. was morbidly obese at the time he left the District and lost at least 60 pounds after entering Latham. His health is significantly improved. N.T. 177-78.

66.     **<u>Restraint.</u>**  This issue was much addressed in the previous due process hearing, in the federal court action, and on remand. However, Judge Kearney addressed restraint in his opinion only to note that the parties agreed that this was part of Q.M.'s difficult transition to Latham. Dist. Ct. Op. at 13.

67.     In sum, none of the District's attacks on Latham show that it is not "a proper placement under the Act."

**C.  Q.M.'s Parents Acted Reasonably.**

68.     On this factor, the "third prong" of the test for tuition reimbursement, the evidence shows that the Parents worked cooperatively with the District during development of the IEP of March 25, 2022 and provided the information the District needed to address their son's need for food security.

69.     Throughout the last three years of discussing Q.M.'s placement with District staff, the parents have discussed Q.M.'s need for placement at Latham in complete good faith. In response, the District has responded by shutting down discussion and ceasing to communicate. 2021 N.T. 317-19.

70.     Q.M. was originally referred to Latham by his endocrinologist, Dr. Jennifer Miller, in October, 2020.  2021 N.T. 262-63, 283, 333-34, 497. Shortly thereafter, in an IEP meeting on November 3, 2020, after a series of behavioral incidents that prompted the District to ask the Parents to take Q.M. home, the Parents introduced the concept of a private residential placement for Q.M..

71.     Unlike those parents who have "hid the ball," not sharing their concerns with the District and allowing flaws in the IEP to go uncorrected, *see, e.g., Michael F. v. Upper Darby Sch. Dist.*, No. 21-5653, 2023 U.S. Dist. LEXIS 60595, at *25-26 (E.D. Pa. Apr. 6, 2023)*; Schoenbach v. District of Columbia,* 309 F. Supp. 2d 71, 85 (D.D.C. 2004), Q.M.'s parents were completely open about their concern that because of Q.M.'s worsening PWS, escalating behavioral challenges, and need for greater food security, he needed residential placement. They brought Dr. Miller's recommendation to the District's attention almost immediately, and did not delay in placing the appropriateness of Q.M.'s IEP at issue, unlike the parents in *Shane T. v. Carbondale Area Sch. Dist.*, No. 3:16-0964, 2017 U.S. Dist. LEXIS 163683, at *54 (M.D. Pa. Sep. 28, 2017).

72.     The District informed the Parents that before it could consider placement outside the District, Q.M. would have to go through all the in-district District programs. 2021 N.T. 336, 349. Nevertheless, the Parents cooperated in the District's reevaluation and development of the IEP in the spring of 2021. They fully expressed their concerns and provided a detailed, timely

letter giving notice to the school district of their intent to place Q.M. at Latham and seek

reimbursement.

73.     In preparation for the 2022 IEP meeting, the Parents provided records from

Latham at the District's request. When the District asked the Parents to execute a release so that

the District could obtain records directly from Latham, the Parent's counsel asked the District

what records it wanted, and agreed to provide them. On February 3, 2022, counsel for the Parents

wrote to District counsel as follows:

> The Central Bucks School District has [M.M.and T.M.] to execute a release of records to
> obtain records from the Latham Centers. If you will advise me what records the District
> would like, I will be happy to provide relevant documents, within reason. Of course the
> parents will send progress reports from Latham.[3]

74.     District counsel replied,

> The District is seeking more than just records. They would like to speak with his teachers
> also. As far as records go, they are requesting his current IEP, progress reports,
> behavioral data, restraint information, and the names of instructional materials they are
> currently using. Any data directly related to current present academic levels would also
> be useful.

S-5 at 3.

75.     The District's counsel requested education-related records only, not documents

related to food security. The District did not request daily notes and logs, and so the Parents did

not provide them.

76.     T.M. supplied the District with the education records requested, except for the

names of instructional materials Latham was using because she did not have that information and

---

[3] Many logical reasons support the preference of parents' counsel for providing the documents to the District
through counsel, rather than providing a blanket release that would allow the District to obtain any and all
types of records from Latham directly, regardless of their relevance to Q.M.'s education. They include: the
need to know the precise identity of the documents that have been shared with the District and the need to
protect the privacy of a teenager in a residential setting by screening out any documents that are irrelevant to
Q.M.'s educational program and may contain highly personal information.

it was not in Q.M.'s educational file.  T.M. wrote to District case manager Dan Bartleson on

March 31, 2022, that Q.M. had had no restraints that quarter. *See* S-7 at 1, 3.

77.     T.M. responded to the District's request to She coordinated an online meeting

with District and Latham staff and set aside a 2-hour window for that meeting. Mr. Bartleson

informed her that the District needed only half an hour to meet. At the end of the meeting,

Mr. Bartleson informed T.M. that it had no further questions about Q.M.

78.     The meeting with Latham staff took place on March 11, 2022, well before the IEP

and Notice of Recommended Educational Placement was issued on March 25. The District's

agenda was limited to education issues: curriculum in core academic subjects, community based

instruction, related services, behavioral support and progress reporting. P-7 at 1. No issue about

food security was raised.

79.     In May, 2022, the District issued a subpoena to Latham and obtained hundreds of

pages of documents and correspondence. By this time, the District had filed its appeal of the

Hearing Officer's decision, and it is a fair hypothesis that the District sought to obtain discovery

in the federal action (the subpoena issued from the federal court), not information relevant to IEP

development.

80.     The parents' failure to sign the release the District requested did nothing to

prevent the District from developing an appropriate IEP for Q.M.  Parents' counsel is aware of

only one case holding that parents' failure to sign a release of confidential records should bar it

from receiving full reimbursement for tuition at a private school when the District has failed to

offer an appropriate IEP, *Cobb Cnty. Sch. Dist. v. A.V.*, 961 F. Supp. 2d 1252, 1272 (N.D. Ga.

2013), and that decision concerned an outright refusal to execute a release rather than an offer to

supply the records voluntarily.

81.     The primary reason that Q.M. needs a residential placement, and specifically placement at Latham, is his need for total food security caused by the severity of his Prader-Willi syndrome. Thus, Q.M.'s need for total food security is the principal issue in this case.

82.     The District cannot possibly fault the parents for failing to provide it with the information about Q.M.'s need for food security that would have enabled the District to develop an adequate IEP for him. The District's effort to blame the parents for the quality of its IEP falls flat, for several reasons.

83.     First, the District had ample opportunity to question Latham staff about any matters related to Q.M. that it deemed important. At the due process hearing, the District's case manager testified that Latham staff answered all his questions and did not withhold any information. He and other District staff did not see a need for follow-up or to obtain additional documents. Asked how the team would have changed the IEP if he had had additional documents, he responded that the team might have "tweaked" the behavior support plan. The adequacy of the District's behavior plan is not the reason that Q.M. needs to be at Latham.

84.     Second,  the District cannot credibly claim that it did not know that Q.M. needed total food security to receive a free, appropriate public education. They had received a Letter of Medical Necessity from Dr. Miller, heard testimony from Dr. Miller and Latham staff, received the Hearing Officer's decision and engaged in discovery in the federal action. However uninformed about Q.M.'s need for food security they might have been in the spring of 2021, they could not claim still to be uninformed a year later.

85.     Finally, although the District knew that Q.M. had Prader-Willi syndrome from the time he entered the District and that his condition had become more severe over time, it never retained an expert consultant in Prader-Willi syndrome or arranged to have him evaluated by a

19

professional with expertise in that condition. Given the severity of Q.M.'s condition, the District could not adequately evaluate him without such expert opinion.

86.     In sum, it would be manifestly unjust to the Parents to reduce, let alone to eliminate altogether reimbursement for Q.M.'s tuition at Latham because they declined to sign a global release.

**D.  The Hearing Officer's Errors.**

87.     The Hearing Officer ruled in favor of the District and dismissed Q.M.'s complaint. She held that the District's proposed IEP of March, 2022 offered a free, appropriate public education and that the parents acted unreasonably in refusing to sign a blanket release of records.

88.     The Hearing Officer committed errors of law and abused her discretion as described below.

89.     The Hearing Officer's legal conclusion that the District provided Q.M. with a free, appropriate public education is contrary to her previous opinion of January, 2022, that Q.M. needed residential placement. Q.M.'s need for the level of care provided by Latham was no less in March, 2022 than it was at the time of the previous due process hearing, when the Hearing Officer held:

> The testimony of Student's endocrinologist as to Student's medical needs, coupled with the testimony of Private Placement professionals, leads to the inescapable conclusion that Student a structured, food secure, residential environment that includes care 24 hours a day, 365 days a year, focused on daily living skills and developing coping and emotional regulation skills in order for Student to derive benefit from, and receive, an education. As such, Student's medical needs are not segregable from, but rather are part and parcel of, the specially designed instruction Student requires based on Student's unique circumstances.

Hearing Officer Decision, ODR No. 24978-20-21 (January 15, 2022) at 29-30.

90.     The Hearing Officer erred in holding that the opinions of Dr. Jennifer Miller, Q.M.'s endocrinologist, were irrelevant to the appropriateness of the District's IEP of March 25, 2023. Hearing Officer Decision, ODR No. 27061-22-23 (May 20, 2023) (hereinafter "H.O. Dec.") at 21. Dr. Miller's opinions were based on her treatment of Q.M. as his physician since he was eight or nine years old, N.T. 168, including her most recent examination of Q.M. on March 27, 2023. N.T. 170. (Dr. Miller had been unable to examine Q.M. in person during the COVID-19 pandemic.)

91.     The Hearing Officer had relied significantly on Dr. Miller's opinions and testimony in the previous due process hearing, and her opinions were, if anything, stronger in the proceeding from which this appeal is taken. She testified in both hearings that Q.M., because of his medical needs, requires the level of food security that Latham is uniquely equipped to provide.

92.     In the present proceeding, the Hearing Officer found Dr. Miller credible but rejected her opinion, stating that "[t]he issue presented is whether the District's proposed program in March 2022 was reasonably calculated provide FAPE to Student based on information known at the time. The issue is not whether Student may need Private Placement as of the spring of 2023." H.O..Dec. at 23.

93.     The Hearing Officer's errors were both factual and legal. Factually, Dr. Miller's testimony was that Q.M. has needed placement at Latham at least since he was in eighth grade, that he continues to need it, and will need a residential level of care for the rest of his life. Her opinion was not that he had come to need residential placement only in the spring of 2023. It would be absurd to conclude that Q.M. needed placement at Latham in the spring of 2021, ceased to need it during the sliver of time when the IEP of March 2022 was being developed, and

then came to need it again in the spring of 2023. That is contrary to everything the experts in

Prader-Willi testified to in both hearings: Prader-Willi is a life-long disability, with Q.M. at the

severe end of the spectrum of that disorder, and one does not "recover" from Prader-Willi.

94.     Legally, the Hearing Officer's conclusion is contrary to the settled law of the

Third Circuit, which holds that evidence acquired after the IEP being challenged is relevant and

admissible to prove the appropriateness or inappropriateness of the IEP at the time it was offered.

*See Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751 (3d Cir. 1995); *Fuhrmann v. E. Hanover Bd. of*

*Educ.,* 993 F.2d 1031, 1040 (3d Cir. 1993) ("evidence of a student's later educational progress

may only be considered in determining whether the original IEP was reasonably calculated to

afford some educational benefit"); *William D. v. Manheim Twp. Sch. Dist.,* No. 04-4535, 2005

U.S. Dist. LEXIS 21437, at *3 (E.D. Pa. Sep. 27, 2005).

95.     The Hearing Officer erred in holding that the IEP offered by the District offered

the level of food security that the parents and their experts testified Q.M. needs. The Hearing

Officer found the IEP appropriate because of features, such as minimal training in Prader-Willi

syndrome for District staff, the support of a 1:1 aide and limiting Q.M. to snacks brought from

home, *see* H.O. Dec. at 22-23, that were already in Q.M.'s IEP when he was placed at Latham.

The IEP does not provide, and it would probably be unrealistic for the District to provide, for

Q.M. to be educated in a building from which food is absent, which the experts in Prader-Willi

syndrome testified that he needs.

96.     The Hearing Officer mischaracterized Dr. Miller's testimony.

97.     Dr. Miller actually testified that because Prader-Willi is a spectrum disorder, *some*

students with the syndrome are able to be educated successfully in a public school. She further

testified that Q.M. is not one of those students: "I have never known – unfortunately -- I have

seen a lot of individuals with Prader-Willi, anyone with this degree of issues that [Q.M.] has, this sort of constellation of issues that Quinn has, to be successful in a public school environment." N.T. 188. *See also* N.T. 186.

98.     The Hearing Officer erred in holding that the placement offered by the District was appropriate because it was less restrictive, that is, offered more opportunity to be educated with students without disabilities, than Latham Centers. H.O. Dec. at 22. Under long-established Third Circuit law, parents who place their child unilaterally in a school for students with disabilities are not required to locate another school that would satisfy the least restrictive alternative requirement.  The only test of appropriateness is whether the parents' choice would provide an appropriate education for the student. *Warren G. v. Cumberland County School Dist*, 190 F.3d 80 (3d Cir. 1999); *Ridgewood Board of Education v. N.E.,* 172 F.3d 245, 249 (3d Cir. 1999).

99.     Similarly, the Hearing Officer erred in her uncritical acceptance of the District's contention that Latham was inappropriate because it had not developed a "discharge plan" for Q.M. H.O. Dec. 1t 23. The unrebutted evidence showed that Q.M. will need a residential level of care for the rest of his life, and absent a showing that discharge would be appropriate for Q.M., no legal requirement dictates that he should have a discharge plan.

100.     As discussed above, the Hearing Officer erred and abused her discretion in holding that the Parents' failure to execute a blanket release of records should act as a complete bar to tuition reimbursement. No evidence on the record suggests that the District was prejudiced by the failure. It received the records it requested from the parents; the parents consented to the District's interviewing Latham staff; the district used only a quarter of the allotted time to question Latham staff; and it insisted that it did not need additional information or documents.

To punish the parents by denying tuition reimbursement altogether for something that did not impede the district in developing an appropriate IEP would be manifestly unfair.

## V.  CLAIMS.

**COUNT I**
**IDEA**
**U.S.C.A. §1400,** *et seq.*

101.    Plaintiffs repeat each paragraph above as if set forth at length herein.

102.    The District violated Q.M.'s rights secured by IDEA, 20 U.S.C. § 1400, *et seq.* and 34 C.F.R. part 300 by:

    (a)  Denying Q.M. a FAPE in violation of 20 U.S.C. §§1412(a)(1)(A) and1414(d)

    (b)  Failing to conduct evaluations that are "sufficiently comprehensive to identify all of the child's special education and related service needs," and provide "relevant information that directly assists in determining the child's educational needs. 20 U.S.C. §§ 1414(a)(1)(C)(i)(II), 1414(a)(2)(A),1414(b)(2)(A)(ii), 1414(b)(3)(B); 34 C.F.R. §§300.304(c)(1)(ii—iv), (2), (4),(6), (7);

    (c)  Failing to provide Q.M. with an IEP that provided a program and placement that assures total food security;

    (d)  Predetermining Q.M.'s educational placement, in violation of Parents' right to participate in educational decision-making for their son, with the result that Q.M. has been denied educational benefit.

103.    The Parents acted reasonably in continuing Q.M.'s at the Latham Centers and continuing to seek tuition reimbursement from the District.

**COUNT II**
**SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794**

104.    Plaintiffs repeat each paragraph above as if set forth at length herein.

105.    The District violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. § 104.4 by:

(a) denying Q.M. the opportunity to participate in and benefit from federally assisted education services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

(b) affording Q.M. an opportunity to participate in or benefit from public education that is not equal to that afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

(c) providing Q.M. with public education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii);

(d) limiting Q.M.'s enjoyment of the right and opportunity to receive a public education, in violation of 34 C.F.R. § 104.4(b)(1)(vii)

106.    By failing to provide reasonable accommodations, including services proven by research and prior demonstrated efficacy to be effective to meet Q.M.'s unique needs, District personnel acted with deliberate indifference to Q.M.'s federally protected rights.

## COUNT III
## TITLE II OF THE ADA, 42 U.S.C. § 12132

107.    Plaintiffs repeat each paragraph above as if set forth at length herein. \

108.    The District intentionally and purposefully violated Q.M.'s rights secured by the ADA, 42 U.S.C. § 12132, *et seq.* and 28 C.F.R. § 35.130 by:

(a) subjecting Q.M. to discrimination, in violation of 28 C.F.R. § 35.130(a);

(b) excluding Q.M. from participating in and denying him the benefit of District services, programs, and activities on this basis of his disability, in violation of 28 C.F.R. § 35.130(b)(1)(i);

25

(c) denying Q.M. the opportunity to participate in and benefit from aids, benefits and services on a basis equal with that afforded others, in violation of 28 C.F.R. § 35.130(b)(1)(ii);

(d) refusing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against Q.M., in violation of 28 C.F.R. § 35.130(b)(7);

(e) limiting Q.M. in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service, in violation of 28 C.F.R. § 35.130(b)(1)(vii).

**WHEREFORE**, Parents respectfully request that this Court:

(1) Receive the record of the administrative hearing;

(2) Receive additional evidence at the request of a party;

(3) Reverse the decision of the Hearing Officer;

(4) Grant the Parents' request for tuition reimbursement at Latham Centers;

(5) Find that the District's IEP of March 25, 2022 is inappropriate, that Latham is an appropriate placement; that Q.M. continues to need residential placement to obtain a free, appropriate public education, and that the Parents acted reasonably;

(6) Enter judgment for the Parents and against the District;

(7) Ensure that the District maintains Q.M.'s current educational placement at Latham Centers throughout the pendency of this proceeding;

(8) Award Parents their reasonable attorney's fees and costs; and

(9) Grant any other relief the Court deems appropriate.

Dated: <u>August 17, 2023</u>  Respectfully submitted,

         REISMAN CAROLLA GRAN & ZUBA LLP

         <u>*s/ Judith A. Gran*</u>
         Judith A. Gran
         PA ID No. 40134
         19 Chestnut Street
         Haddonfield, NJ 08033
         t 856.354.0021
         f 856.873.5640
         judith@rcglawoffices.com