**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Q.M., M.M., T.M. | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 23-3180 |
| | : | |
| CENTRAL BUCKS SCHOOL | : | |
| DISTRICT | : | |

## MEMORANDUM

KEARNEY, J.                                                    February 28, 2024

We found last year the Central Bucks School District did not provide the free appropriate public education required by Congress to a tenth-grade student in its district with Prader-Willi syndrome. We affirmed detailed findings of a Hearing Officer based on governing law and developed evidence. We ordered the District pay for necessary residential out-of-state placement.

The District prepared a substantially similar individualized education plan for the student's eleventh-grade year. It argued the eleventh-grade plan now met Congress's mandate. The parents disagreed. The parties returned to the same hearing officer for two days of hearings with largely the same witnesses. The hearing officer changed her mind finding the District's substantially similar eleventh-grade plan meets Congress's mandate. You would think we would see a thoughtful "compare and contrast"; why a new conclusion for eleventh grade? We studied the administrative record on the eleventh-grade plan. The hearing officer does not offer distinct grounds. The hearing officer also altered the governing law she properly applied to the tenth-grade plan last year. We cannot affirm or reverse without more analysis under the correct legal standards. We remand to allow a hearing officer to follow governing law and explain decisions consistent with today's guidance. We affirm the District's obligations to continue to fund the high school residential placement education.

I.    **Background**[1]

Eighteen-year-old Q.M. and his family chose to live in the Central Bucks School District where he began his educational journey in kindergarten.[2] The District identified Q.M. as a child with a disability based on the school-age disability category of Other Health Impairment.[3]

Q.M. attends school while challenged by Prader-Willi syndrome.[4] Q.M. and others with Prader-Willi syndrome develop an extreme hunger beginning in childhood, which can lead to chronic overeating (hyperphagia) and obesity.[5] Typical characteristics of Prader-Willi syndrome include constant hunger and food seeking behaviors with an inability to feel satisfied.[6] Seeing or smelling food triggers extreme anxiety.[7] People with Prader-Willi syndrome also typically have mild to moderate intellectual impairments, learning disabilities, and difficulty sleeping.[8] Behavioral problems are also common, including temper outbursts and compulsive behavior.[9] Prader-Willi syndrome is a spectrum disorder and the physicians and educational professionals confirm Q.M. falls somewhere along the more severe end of the continuum.[10]

There is no known cure for Prader-Willi syndrome.[11] But physicians identified various treatments including strict supervision of daily food intake, growth hormone therapy, sleep treatments, physical therapy, behavioral therapy, medications, speech therapy, and special education.[12] Group homes offer necessary structure and supervision for adults with Prader-Willi syndrome by helping to avoid compulsive eating, severe obesity, and other health problems.[13]

*Q.M. attends seventh, eighth, and ninth grade at a District school.*

Q.M.'s behavioral and food-related issues began to intensify at home and at school when he entered middle school.[14] Q.M.'s father testified Parents began to lock their refrigerator and pantries at home by the time Q.M. entered sixth or seventh grade.[15] Q.M.'s father swore these steps did not work because Parents would still find food wrappers in Q.M.'s room and Q.M.

eventually found out where they hid the keys.[16] Q.M. also began eating things he should not consume while at home, such as a container of cream cheese and a frozen casserole.[17]

The District implemented an individualized health care plan in February 2019 confirming it knew of Q.M.'s "[r]isk for noncompliance with food management plan related to lack of ability to feel satiety" and included the District's goal to provide various interventions including having Q.M. only bring in food from home and not buy food at school, providing an adult monitor him in a discrete manner during lunch so he does not share or trade food, and educating staff members working with Q.M. on Prader-Willi syndrome.[18]

Q.M. attended the District school for seventh, eighth, and ninth grade under individualized education plans.

### *November 2020 IEP Meetings.*

The District conducted two IEP meetings in November 2020 (Q.M.'s ninth-grade year) and the team discussed Q.M.'s behavior at home and his Parents' concerns over Q.M.'s worsening behaviors.[19] Parents raised the possibility of residential placement for Q.M.[20]

### *Q.M.'s February 2021 IEP for the tenth-grade year.*

The District prepared an IEP for Q.M. in February 2021 to be implemented through February 2022 of Q.M.'s tenth-grade year.[21] The District proposed to continue much of what it previously provided to Q.M. in terms of food security including: [22]

- One-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management;

- Two scheduled snack times for Q.M with food brought from home;

- Q.M. would not receive food from school unless coordinated in advance with Parents;

- IEP team would be trained by the Prader-Willi Syndrome Association's Wyatt Special Education Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.

Parents expressed concerns during the February 2021 IEP meeting about the proposed transition options given Q.M.'s disability which requires him not to access food.[23] Parents also asked about the process for making out-of-district placements.[24] Parents ultimately shared their disapproval of the February 2021 IEP but consented to its implementation.[25]

### Parents notify the District of their intent to send Q.M. to the Latham Centers.

Parents notified the District of their intent to place Q.M. at the Latham Centers, an out-of-state residential placement at public expense on May 3, 2021.[26] Latham Centers serves children between the ages of eight and twenty-two with complex disabilities including Prader-Willi syndrome at a campus in Massachusetts which includes two dormitories, a clinical service building, and a main house with dining and nursing services.[27] It provides services twenty-four hours a day for every day of the year.[28]

### District's revised May 2021 IEP for Q.M.'s tenth-grade year.

The District issued a revised IEP in May 2021 after learning of the Parents' intent to move Q.M. to Latham Centers. The District IEP team recommended Q.M. attend Central Bucks High School West for his tenth-grade year. The IEP provided for direct instruction in the special education classroom for reading, writing, math, social skills, self-regulation skills, employability skills, science, and social studies in order to provide smaller group environments and peers with whom Q.M. could practice social skills.[29] The District proposed Q.M. be instructed in the general classroom only for physical education/health, one elective, homeroom, lunch, and community-based instruction.[30] Q.M. would spend approximately one-third of his day in the regular classroom.[31]

The District offered Q.M. accommodations (like earlier IEPs) to address Q.M.'s need for a food secure environment including:[32]

- One-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management;

- Two scheduled snack times for Q.M with food brought from home;

- Q.M. would bring food from home during lunches and would not buy anything from the cafeteria;

- Q.M. would not receive any food from school (lunch, special events, etc.); and

- IEP team would be trained by the Prader-Willi Syndrome Association's Wyatt Special Education Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.

### *Parents enroll Q.M. at Latham Centers.*

Q.M.'s parents enrolled Q.M. at the Latham Centers in May 2021.[33] Parents shared a recommendation letter from Dr. Jennifer Miller, Q.M.'s endocrinologist, with the District in August 2021 confirming Q.M. should be placed in a specialized residential school to address his complex needs.[34] Endocrinologist Dr. Miller also noted Q.M's cognitive weaknesses and confirmed Q.M.'s behavioral challenges have gradually grown more problematic over time as his medical condition due to Prader-Willi syndrome worsened.[35]

### *Parents seek a due process hearing ten days after enrolling Q.M. at Latham Centers.*

Parents filed a due process administrative complaint on May 27, 2021 against the District alleging it failed to provide a free appropriate public education to Q.M.[36] Parents sought compensatory education, compensatory damages, reimbursement for tuition and costs of unilateral placement of Q.M. at Latham Centers, a finding District's actions violated Section 504 and Title II of the ADA and resulted in discriminatory denial of access to education, and reimbursement for attorneys' fees and other costs, including expert witness fees.[37]

### *Q.M. attends the Latham Centers for tenth grade (2021–2022 school year).*

Q.M. spent his tenth-grade year (2021-2022 school year) at the Latham Centers.

*Due process hearing and Hearing Officer Skidmore's January 15, 2022 decision.*

Hearing Officer Cathy A. Skidmore, Esquire presided over a four-day due process hearing beginning on October 12, 2021. She evaluated the credibility of testimony from ten witnesses including Q.M.'s parents, Q.M.'s endocrinologist, District personnel, and Latham Centers's personnel.[38]

Q.M.'s endocrinologist Dr. Jennifer Miller is a leading researcher and physician in the field of Prader-Willi syndrome. She testified Q.M. needs "completely restricted access to food" to manage his Prader-Willi syndrome.[39] She opined "[Q.M.] is not able to get an adequate, safe and effective education in his current school system."[40] She opined placement at Latham Centers is necessary for Q.M. to receive an appropriate education.[41] She explained Latham Centers can address Q.M.'s problems because it specializes in Prader-Willi syndrome and "keep[s] food completely away from the educational setting."[42]

The Parents adduced Dr. Dana Henning to offer an expert opinion in the education of students with significant disabilities and complex support needs.[43] Dr. Henning has experience in the education of individuals with Prader-Willi syndrome and had the opportunity to observe Q.M. at the District school and at Latham Centers.[44] Dr. Henning explained food security is a common approach to working with people with Prader-Willi syndrome because "the idea of making an environment food secure makes it clear to a person after a while that there just is no food to be had here" and "it relieves the anxiety of constantly being on the lookout for food[.]"[45] Q.M.'s parents also testified at the hearing.

Latham Centers' director of program marketing and admission Brittni Kliment testified.[46] Parents also called the director of Prader-Willi syndrome services at Latham Centers Patrice Carroll to testify.[47] Director Carroll testified Q.M. presents with severe Prader-Willi syndrome

and "absolutely needs a food secure environment."[48] She explained at Latham Centers "there's no food anywhere where [Q.M.] can get to" because "[t]he kitchen's locked" and teachers do not walk around with coffee or have food in their desks and "if we're eating, it's the same food that [the students are] eating at the same time."[49]

Hearing Officer Skidmore also evaluated testimony adduced by the District, including testimony from the supervisor of special education for the District, a board-certified behavior analyst for the District, the principal of Holicong Middle School where Q.M. attended for approximately three years, and a special education teacher and the athletic director at Holicong Middle School.

Hearing Officer Skidmore found the testimony of Parents and District professionals persuasive and "accorded significant weight" as to their understandings of Q.M. given their significant experience and expertise.[50] She found the testimony of Endocrinologist Dr. Miller "cogent and compelling with respect to [Q.M.'s] medical condition and needs given her extensive qualifications."[51]

Hearing Officer Skidmore issued her decision on January 15, 2022 finding: (1) the District did not deny Q.M. a free appropriate public education for the 2019–2020 and 2020–2021 school years (eighth and ninth grades); (2) the District's May 2021 IEP failed to offer Q.M. a free appropriate public education for the 2021–2022 school year (tenth grade); and (3) Parents are entitled to reimbursement of 85% of the tuition and related costs, including residential costs, for the 2021–2022 school year at the Latham Centers.[52]

Hearing Officer Skidmore found private residential placement at Latham Centers necessary and appropriate for tenth grade because it provides intensive, structured programming and care twenty-four hours a day, 365-days a year, and Q.M. progressed at Latham Centers.[53]

Officer Skidmore explained, "[Q.M.'s] medical condition is one that tends to progress over time, becoming more and more severe, and it has followed that course for Student."[54] Officer Skidmore recognized the District understandably offered Q.M. placement in a District school based on its obligations to provide the "least restrictive environment," but ultimately concluded Q.M. "requires a residential placement at this time in order to be provided with FAPE" based on his presentation.[55] Officer Skidmore concluded "[Q.M.] will most likely require a residential placement for the remainder of Student's life."[56]

Officer Skidmore credited Endocrinologist Dr. Miller's testimony, even though she provided her opinion after the Parents made the decision to place Q.M. in residential placement, reasoning "the record establishes that there was insufficient consideration of the reasons for [Q.M.'s] increasingly difficult behavioral presentation and the medical reasons therefor over the course of the 2020-21 school year."[57] Hearing Officer Skidmore limited her opinion to Q.M.'s tenth grade by noting "this decision is confined to the 2021-22 school year."[58]

### The District requests records in advance of March 2022 IEP meeting.

The District and Parents agreed to meet on March 10, 2022 so the District could propose an IEP and placement for Q.M.'s eleventh-grade school year.[59] The District asked Parents to sign a release of records to obtain updated information on Q.M. from Latham Centers.[60]

Counsel for Q.M.'s Parents responded agreeing to produce progress reports from Latham Centers and asking the District to identify the other documents it needs on February 3, 2022.[61] The District's counsel responded the same day:

> The District is seeking more than just records. They would like to speak with his teachers also. As far as records go, they are requesting his current IEP, progress reports, behavioral data, restraint information, and the names of instructional materials they are currently using. Any data directly related to current present academic levels would also be useful.[62]

The District still had not obtained Parents' written permission or received Q.M.'s records a month later. The District emailed the Parents another release on March 4, 2022 to request records from Latham Centers in advance of the March 10, 2022 IEP meeting with the District.[63] The Parents did not sign a release but agreed to convening a separate, remote meeting between District representatives and Latham Centers staff and to forward a copy of Q.M.'s IEP.[64] The District, Latham Centers, and Parents eventually arranged to meet on March 14, 2022 – four days after Q.M.'s IEP meeting with the District.[65]

Parents sent the District Q.M.'s three-page undated IEP from Latham Centers labeled "draft IEP" two days before the March 10, 2022 IEP meeting with the District.[66]

### March 10, 2022 IEP meeting regarding eleventh grade.

The District held the IEP meeting on March 10, 2022 to present the draft IEP for eleventh grade to the District's IEP team, Parents, and legal counsel.[67] The IEP team discussed the measures the District proposed to provide Q.M. food security.[68]

The District IEP team discussed providing Q.M. a full-time paraprofessional to manage and restrict his access to food.[69] Parents stated they did not want to include a full-time paraprofessional in the IEP because Q.M. does not have one-on-one support at Latham Centers.[70]

The District IEP team proposed locking cabinets and refrigerators with food across all classroom settings.[71] Q.M.'s mother testified she expressed during the meeting this measure is inadequate to provide total security because Q.M. is highly anxious knowing food is in his environment even if it is behind locked doors.[72]

The District IEP team originally proposed placing Q.M. in a life skills classroom containing a full kitchen where food preparation activities would take place as part of a curriculum aimed to develop employment-related skills.[73] The District IEP team determined this

environment would trigger Q.M.'s anxiety because of its proximity to food and food-related concepts.[74] They agreed Q.M. would instead receive life skills instruction in a different environment within the school without a full kitchen.[75] The IEP team also proposed individualizing the life skills instruction for Q.M. so it did not involve developing food-related skills.[76]

The special education classroom sometimes utilized community-based activities and instruction where students practice life skills like taking public transportation or grocery shopping in real-life settings. The District and Parents discussed the need for home-school communications before any type of community-based instruction took place so Parents and the District could address the circumstances of each location and discuss whether it was appropriate for Q.M. to attend.[77] The District IEP team agreed with Parents Q.M. would not participate in any community instruction involving grocery shopping to avoid triggering his anxiety.[78] The proposal provided Q.M. would receive "[t]raining in a natural setting (Domestic and Vocational Skills) that do [sic] not involve food."[79]

### *District again requests records from Q.M.'s Parents on March 11, 2022.*

The District again requested records from Parents on March 11, 2022—after the eleventh-grade IEP meeting but before the District offered the final IEP.[80] Q.M.'s mother responded the same day she would not share the documents in advance of the upcoming meeting between the District and Latham Centers scheduled for March 14, 2022, explaining she preferred to share the documents during the remote meeting.[81]

### *March 14, 2022 District meeting with Latham Centers.*

District representatives met with Parents and Latham Centers staff for thirty minutes over a remote meeting on March 14, 2022. Latham Centers' staff answered the District's questions

about Q.M.'s present academic levels and curricula, employment and independent living services, and behavior support needs.[82] The IEP team reviewed the functional behavioral assessment and behavior plan. The District did not follow up or request documents after the meeting other than a copy of Q.M.'s behavior plan.[83] The District received the November 2021 functional behavioral assessment and progress report data from Q.M.'s mother after the meeting.[84]

### The District sues the Parents.

The District sued Q.M. and his Parents before us on March 21, 2022 concerning the Hearing Officer's decision on the tenth-grade plan. The District sought to overturn the portion of Hearing Officer Skidmore's decision ordering the District to reimburse Parents for 85% tuition for the tenth-grade 2021–2022 school year and asked we find the May 2021 IEP provided Q.M. a free appropriate public education during tenth grade.[85]

### Parents reject the March 2022 eleventh-grade IEP.

The District sent a final proposed eleventh-grade IEP to Parents on March 25, 2022, during the pendency of our review of the District's appeal. The District provided a Notice of Recommended Educational Placement (NOREP) with the proposed IEP.[86]

The District proposed Q.M. would participate in a functional curriculum emphasizing self-help, daily living skills, self-advocacy/self-determination, and recreation/leisure activities.[87] Q.M. would receive direct instruction in special education classes for reading, writing, math, social skills, self-regulation skills, employability skills, science, social studies, life skills, and hygiene skills and would receive instruction in the general education classroom only for physical education, lunch, and community-based instruction.[88] Q.M. would spend approximately 19% of his day in the regular classroom.[89]

11

Transition services in the March 2022 IEP included a post-secondary goal to attend a training program for public safety or a related field, an employment goal of supported employment, and an independent living goal of supported living.[90] The March 2022 IEP contained a Positive Behavior Support Plan (PBSP) addressing non-compliance and aggression based on Latham Centers' functional behavior assessment. Related services included individual and consultative occupational, physical, and speech and language services.

The District in the eleventh-grade IEP explained: "[Q.M.] cannot be around other students who are eating or preparing food in the classroom. [He] may get frustrated and yell[.]"[91] The District provided steps to address Q.M.'s need for a food secure environment:

- Food security by locking cabinets with food and locking refrigerators across all classroom settings;

- One-on-one paraprofessional support for inclusion, academic differentiation, behavior, transitions, and food management;

- Two scheduled snack times for Q.M with food brought from home;

- Q.M. would bring food from home during lunches and will not buy anything from the cafeteria;

- An adult to monitor Q.M. during lunch in a discrete manner to ensure no sharing or trading of food;

- Parents and District would discuss strategies for managing food in a variety of settings (field trips, extra-curricular activities, etc.) as needed;

- Parents may attend field trips if desired; and,

- IEP team would be trained by the Prader-Willi Syndrome Association's Wyatt Special Education Advocacy Training on facilitating inclusion and addressing in-school behavioral challenges.[92]

Parents sent the District their signed notice disapproving of the March 2022 IEP on March 31, 2022 and provided for the first time Q.M.'s written comprehensive treatment plan from the Latham Centers.[93]

***The Parents counter-sue the District.***

The Parents responded to the District's lawsuit regarding the tenth-grade year by counter-suing the District for compensatory education for the 2019–2020 and 2020–2021 school years, additional tuition reimbursement for the 2021–2022 school year, and attorney's fees and costs and compensatory damages under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Individuals with Disabilities Education Improvement Act.[94]

Q.M.'s Parents also challenged the District's proposed individualized education plan for his eleventh-grade 2022–2023 school year as addressed in March 2022.

***We affirmed the Hearing Officer's analysis as to the tenth-grade plan and remanded to decide the appropriateness of the March 2022 eleventh-grade plan.***

After studying the administrative record, we found Hearing Officer Skidmore did not err in finding the District provided Q.M. a free appropriate public education for the 2019–2020 (eighth grade) and 2020–2021 (ninth grade) school years. We found the District did not meet its burden to show the May 2021 IEP provided a free appropriate public education for the 2021–2022 (tenth grade) school year. We found the Hearing Officer Skidmore did not err in awarding 85% tuition reimbursement for Q.M.'s 2021–2022 school year at Latham Centers but amended the findings to include 85% reimbursement for tuition incurred between May 2021, when Q.M. began attending Latham, to September 2021, when the 2021–2022 school year began.

We denied summary judgment on the claim arising from the District's proposed March 2022 IEP finding genuine disputes of material fact exist as to whether the March 2022 IEP provides Q.M. a free appropriate public education even though it is substantially similar to the May 2021 IEP.[95] We noted under prong one of the *Burlington-Carter* test, genuine issues of material fact remained as to whether the IEP is reasonably calculated to enable Q.M. to make progress given his circumstances, whether the new IEP provides sufficient food security to

13

enable Q.M. to benefit from education in the District, whether the March 2022 IEP addresses Q.M.'s transition, behavior, and food management needs, and whether the least restrictive environment for Q.M. is a regular high school given Q.M. no longer exhibited certain problematic behaviors at Latham Centers. The parties agreed to remand for fact finding on these and other issues.[96]

### Due process hearing on eleventh-grade plan and Hearing Officer's May 20, 2023 decision.

Parents filed a due process administrative complaint on October 17, 2022 claiming the District did not offer a free appropriate public education to Q.M. for his eleventh-grade 2022–2023 school year. The Office for Dispute Resolution again assigned the case to Hearing Officer Skidmore.

Hearing Officer Skidmore again presided over a two-day due process hearing on December 16, 2022 and April 13, 2023. Hearing Officer Skidmore delayed the second day of the hearing by months to allow Q.M. to see Endocrinologist Dr. Miller in March 2023. Officer Skidmore evaluated the credibility of testimony from witnesses including Q.M.'s Parents, Q.M.'s endocrinologist, District personnel, and Latham Centers' personnel.

Endocrinologist Dr. Miller, who testified at the first due process hearing, testified for Parents in the second due process hearing. Endocrinologist Dr. Miller testified Q.M. still struggles with weight control but improved significantly since she saw him several years earlier and Q.M. still has a lot of anxiety, uncontrolled appetite, and hyperphagia (excessive eating).[97] Endocrinologist Dr. Miller reviewed the March 2022 IEP provisions aimed at providing Q.M. food security and concluded, "It's a good start" but "is not sufficient" because her patients with Prader-Willi syndrome are starving all the time and she has seen them eat food out of garbage cans and off the floor.[98] Endocrinologist Dr. Miller explained she has never known any patient

with Q.M.'s degree of severe manifestations of Prader-Willi syndrome be successfully educated in a public school environment.[99]

Parents also called the Director of Prader-Willi syndrome services at the Latham Centers Patrice Carroll to testify. Director Carroll testified:

> If [someone with Prader-Willi syndrome is] in an environment where there is total food security, where there are other people who understand their syndrome, where they have that exactness in their day, that's when they're able to focus and learn and work on whatever goals they need to work on. Otherwise, they're gonna be hyper-focused on what's next, is the day gonna change, is there food in the third classroom down the hall.[100]

Director Carroll explained every trash can in the school would have to be locked and his peers need to eat the same food he is eating if Q.M. eats lunch with his peers.[101] Director Carroll said she is aware of public schools successfully accommodating students with Prader-Willi syndrome who have less severe manifestations than Q.M., but not students with Q.M.'s level of severity.[102] Q.M.'s Parents also testified.

Hearing Officer Skidmore evaluated testimony adduced by the District, including testimony from the District's Supervisor of Special Education Daniel Bartleson. Supervisor Bartleson testified Q.M.'s mother was "very cooperative" with setting up the meeting between the District and Latham Centers and noted "she did come back and forth to me with things, in a positive way."[103]

Hearing Officer Skidmore found the testimony of each of the witnesses to be "overall credible as to the facts as they recalled them" but "the weight accorded the evidence…was not equally placed."[104] She found the testimony of the District representative "as to what the District knew in March 2022 and what was discussed at the IEP meeting at that time was credible and persuasive in light of the minimal information provided to the District by the Parents."[105] Officer

Skidmore found Endocrinologist Dr. Miller's testimony "was of limited value on the precise issue presented relating to the March 2022 IEP" because her observation of Q.M. took place after the District already offered the March 2022 IEP and cannot be considered as part of the information the District knew at the time it offered the IEP.[106]

Hearing Officer Skidmore issued her decision on May 20, 2023, finding the District's March 2022 IEP offered Q.M. a free appropriate public education for his eleventh grade.[107] Officer Skidmore concluded the March 2022 IEP adequately addressed academic and behavioral concerns and is the least restrictive environment for Q.M. because it provides for participation in the general classroom as well as in the special education classroom.

Hearing Officer Skidmore explained the Parents and the District had a "serious disagreement" over the level of food security in the District high school.[108] Officer Skidmore found the March 2022 IEP adequately met the definition of food security provided by the Parents in their closing statement – "a system in which food is present only during meal times and food is locked up and out of sight at all other times and where, in a school setting, there is no food during instruction, special events or anywhere in the school building except during meal times in the cafeteria."[109] She noted the March 2022 IEP provided specific training to the IEP team and a full-time paraprofessional to make sure Q.M. only ingests food sent from home.[110] Officer Skidmore's analysis focused on what the District knew at the time it offered the March 2022 IEP.

Officer Skidmore characterized Endocrinologist Dr. Miller's and Director Carroll's testimony as concluding "a student with [Q.M.'s] medical condition can be successful in a local school when access to food is managed and restricted and the student is not a danger to self or others."[111]

Officer Skidmore barred tuition reimbursement because of "Parents' limited cooperation in sharing information" as demonstrated by their refusal to execute a release and provide more information from Latham Centers.[112]

### *Parents sue the District concerning the eleventh-grade plan.*

Parents sued the District on August 17, 2023 seeking review and reversal of the Hearing Officer's decision on the eleventh-grade plan.[113] The District continues to fund 100% of Q.M.'s placement at Latham Centers under the Act's "stay-put" provision requiring Q.M. remain in his then-current educational placement during the pendency of any disputes.[114]

## II.   Analysis

The District, Q.M., and Parents ask us resolve issues arising from Hearing Officer Skidmore's May 20, 2023 decision as to whether the March 2022 IEP offers Q.M. a free appropriate public education for his eleventh grade. The parties' dispute largely centers around whether the District can provide sufficient food security to enable Q.M. to receive a meaningful eleventh-grade education.

Parents move for judgment on the administrative record challenging Hearing Officer Skidmore's decision to deny tuition reimbursement for the 2022–2023 (eleventh grade) school year arguing: (1) the District's March 2022 IEP is inappropriate because it does not meet Q.M.'s need for total food security, (2) Latham Centers continues to be an appropriate placement for Q.M., and (3) Parents acted reasonably by cooperating with the District during development of the March 2022 IEP. Parents seek an award of tuition reimbursement for Q.M.'s placement at Latham Centers during the 2022–2023 year, an Order ensuring the District maintains Q.M.'s current educational placement throughout the pendency of this provision, and reasonable attorney's fees and costs.

The District also moves for judgment on the administrative record arguing (1) the Hearing Officer correctly found the March 2022 IEP offered Q.M. a free appropriate public education in the least restrictive environment, and (2) even if the March 2022 IEP did not offer Q.M. a free appropriate public education, the Hearing Officer correctly found the equities bar tuition reimbursement.

We studied the administrative records from the first and second due process hearings. We find we cannot meaningfully review Hearing Officer Skidmore's decision because she does not provide adequate support for her conclusion the March 2022 IEP provides Q.M. a free appropriate public education particularly compared to her earlier detailed findings the substantially similar May 2021 IEP denied Q.M. a free appropriate public education. We remand to Hearing Officer Skidmore to provide fulsome explanations utilizing her specific knowledge and experience and apply the law consistent with this memorandum. We deny both parties' motions for judgment on the administrative record.

**A.      The IDEA framework.**

Property owners including parents of school-age children pay school taxes to fund the public education in their school district. Congress requires states receiving federal education funding must make available a free and appropriate public education to all children with disabilities residing within their borders.[115] Congress authorizes tuition reimbursement for parents who unilaterally decide to place their child in an out-of-district school if the IEP proposed by the school district failed to offer the child a free and appropriate public education and the placement the parents chose is proper under the IDEA.[116] Under the *Burlington-Carter* test, parents are eligible to receive tuition reimbursement if: "(1) the public school did not provide a [free and appropriate public education]; (2) placement in a private school was proper;

and (3) the equities weigh in favor of reimbursement."[117] The District can meet its free appropriate public education obligation under prong one through the development and implementation of an IEP, which is the "centerpiece of the statute's education delivery system for disabled children."[118] The IEP must be "reasonably calculated to enable [Q.M.] to make progress appropriate in light of [his] circumstances."[119]

### B.   The Hearing Officer did not offer sufficient reasons to support her conclusion the District offered Q.M. a free appropriate public education for the eleventh-grade 2022–2023 school year.

Officer Skidmore acknowledges at the outset of her written decision in the second due process hearing "[t]he issue presented here is the same as that in the prior decision relating to the 2021-22 school year."[120] The issue presented in her earlier decision concerned the appropriateness of the May 2021 IEP and the issue presented in the second hearing concerned the appropriateness of the substantially similar March 2022 IEP. Officer Skidmore found the May 2021 IEP appropriate but the March 2022 IEP inappropriate. The different results warrant a thoughtful analysis. Officer Skidmore does not explain the basis for her differing decisions.

Hearing Officer Skidmore found the May 2021 IEP inappropriate in the first hearing because it did not provide Q.M. sufficient food security for his needs. She concluded the evidence "leads to the inescapable conclusion that [Q.M. needs] a structured, food secure, residential environment that includes care 24 hours a day, 365 days a year, focused on daily living skills and developing coping and emotional regulation skills in order for [Q.M.] to derive benefit from, and receive, an education."[121] We affirmed Officer Skidmore's decision. We remanded the issue of the appropriateness of the March 2022 IEP to the Hearing Officer to make findings as to, among other things, whether the March 2022 IEP provides sufficient food security to enable Q.M. to benefit from education in the District.

19

But then Hearing Officer Skidmore found the March 2022 IEP in the second hearing appropriate on remand. Officer Skidmore reasoned the March 2022 IEP identified Q.M.'s areas of educational and functional need, provided goals, specialized instruction, related services, and a behavioral plan, and offered "the least restrictive environment" for Q.M. because it provided Q.M. will be educated in the general classroom for part of the day.[122]

Officer Skidmore devotes very little of her analysis to discussing Q.M.'s needs for food security despite acknowledging the Parents' and the District's "serious disagreement" over the issue. Officer Skidmore's discussion of food security in her second written decision is limited to: (1) a factual summary of the food security provisions in the March 2022 IEP, (2) a description of the March 2022 IEP provisions the District changed based on Parents' feedback, and (3) a conclusory statement "[t]he evidence available to the District in March 2022 also supports" the reasonableness of the March 2022 IEP.[123] Officer Skidmore omits reference to hearing evidence (or a lack thereof) of Q.M.'s actual needs with respect to food security. We cannot fairly review Officer Skidmore's decision as to the appropriateness of the March 2022 IEP without a fulsome explanation of why she concluded it provides sufficient food security for Q.M.'s needs.

Officer Skidmore also omits reference to her earlier fulsome analysis of the May 2021 IEP when analyzing the appropriateness of the substantially similar March 2022 IEP. She does not explain or even attempt to reconcile her two contrasting findings: (1) the District's May 2021 IEP is inappropriate because Q.M. required residential placement, and (2) the March 2022 IEP, offered by the District only ten months later, is appropriate because it returns Q.M. to a non-residential placement in the District. We cannot discern whether Officer Skidmore's differing decisions are based on changes to Q.M.'s IEP or changes to Q.M.'s needs. If Officer Skidmore's decision finding the March 2022 IEP appropriate is based on changes to the May 2021 IEP, she

must identify those changes and explain why they are sufficient to provide food security for Q.M. Officer Skidmore notes the March 2022 IEP contains features such as training in Prader-Willi syndrome for District staff and the support of a one-on-one paraprofessional, but the May 2021 IEP also contained these features so they cannot form the basis for her contrasting conclusions.

If Hearing Officer Skidmore's decision is based on changes in Q.M.'s needs, Officer Skidmore must identify how Q.M.'s needs have changed and explain why the District is now able to meet them. To the extent Hearing Officer Skidmore relied on evidence of Q.M.'s progress or improvement at Latham Centers in support of her finding the March 2022 IEP is appropriate, she must reconcile this finding with her previous finding "[Q.M.] will most likely require a residential placement for the remainder of [his] life."[124] For example, Officer Skidmore made a factual finding Q.M. "managed well" over a ten-day visit home in late May 2022 but she did not explain how this finding factored into her ultimate decision.[125] We also note the District did not adduce an expert opinion Q.M.'s progress or improvement at Latham Centers is permanent, or any evidence to rebut Parents' experts. Additional fact-finding may be necessary to address these questions.

We cannot meaningfully review a decision when we do not know the grounds on which it is based. We remand to Hearing Officer Skidmore to provide reasons for different conclusions based on substantially similar plans.

### C.     The Hearing Officer erred as a matter of law in her analysis of the appropriateness of the March 2022 IEP and tuition reimbursement.

Hearing Officer Skidmore also erred as a matter of law requiring remand and analysis on the correct legal standards. Hearing Officer Skidmore erred in (1) concluding evidence acquired after the creation of an IEP is of limited value in determining the appropriateness of the IEP, (2)

not considering evidence of Q.M.'s food security needs when conducting a "least restrictive environment" analysis, and (3) denying tuition reimbursement based on Parents' subjective intent to keep Q.M. at Latham Centers.

**1.    The Hearing Officer erroneously discounted Endocrinologist Dr. Miller's evaluation after the District offered the March 2022 IEP.**

Hearing Officer Skidmore found Endocrinologist Dr. Miller's testimony "was of limited value on the precise issue presented relating to the March 2022 IEP" because her observation of Q.M. took place after the District already offered the March 2022 IEP and cannot be considered as part of the information the District knew at the time it offered the IEP.[126] Officer Skidmore's conclusion is contrary to her position in the earlier due process hearing and long-established case law providing evidence acquired after a school district offers an IEP may be admitted to the extent it bears on the appropriateness of that IEP when initially drafted.[127]

Hearing Officer Skidmore's position in the second due process hearing is entirely at odds with her position in first hearing. She earlier and correctly relied heavily on Endocrinologist Dr. Miller's opinion in support of her finding Q.M. required residential placement to meet his needs for food security. Officer Skidmore found Endocrinologist Dr. Miller's testimony in the first hearing "cogent and compelling with respect to [Q.M.'s] medical condition and needs given her extensive qualifications."[128] Officer Skidmore then considered Endocrinologist Dr. Miller's opinion even though she offered it *after* the District offered the May 2021 IEP, reasoning:

> "It is true that the opinion of the [Endocrinologist Dr. Miller] was provided after the Parents made the decision to place [Q.M.] in the residential placement. However, the record establishes that there was insufficient consideration of the reasons for [Q.M.'s] increasingly difficult behavioral presentation and the medical reasons therefor over the course of the 2020-21 school year.[129]

But we now have a different view without explanation. Hearing Officer Skidmore later found the same expert's opinion to be "of limited value" in the second due process hearing for a reason she expressly dismissed in the first due process hearing—because Endocrinologist Dr. Miller offered her opinion after the District offered the March 2022 IEP.

Endocrinologist Dr. Miller's opinions should be given the same consideration in the second due process hearing where the record establishes the District similarly failed to consider Q.M.'s need for food security in crafting the March 2022 IEP. The District knew of Parents' food security concerns from the first due process proceeding. Parents raised food security concerns during the March 10, 2022 IEP meeting and the parties discussed the issue at length. But the District failed to ask questions about Q.M.'s food security needs when it met with Latham Centers on March 14, 2022. The District instead questioned Latham Centers staff about undisputed educational issues, including academic curriculum, progress reporting, and behavioral support. The District did not further assess Q.M.'s need for food security before sending a final proposed IEP to Parents on March 25, 2022.

The record in the second due process proceeding, like the record in the first proceeding, establishes the District did not sufficiently consider Q.M.'s food security needs. Hearing Officer Skidmore may credit and seriously consider Endocrinologist Dr. Miller's testimony when determining the appropriateness of the March 2022 IEP. Her failure to do so is contrary to well-established case law as she correctly applied in the first due process proceeding.

Officer Skidmore fails to explain the basis for her decision even if we apply her erroneous standard for assessing whether an IEP is appropriate and consider only the information available to the District at the time it offered Q.M. the March 2022 IEP. The District cannot claim it did not know details of Q.M.'s medical needs with respect to food security when it

engaged in extensive discovery and due process proceedings (including a decision finding a substantially similar IEP inappropriate) in the months leading up to the proposed March 2022 IEP which established Q.M. is on the severe end of the spectrum for Prader-Willi syndrome and Q.M.'s medical condition has only become more serious over time.[130]

Hearing Officer Skidmore erroneously concluded Endocrinologist Dr. Miller's testimony is of "limited value" because she evaluated Q.M. after the District offered the March 2022 IEP.

> **2.** **The Hearing Officer erred by not considering whether the District school is the least restrictive environment based on Q.M.'s individual needs for food security.**

Hearing Officer Skidmore must revisit the basis for her finding the District offered Q.M. a free appropriate public education in the least restrictive environment. Officer Skidmore's failure to consider Q.M.'s needs in her analysis of the least restrictive environment is contrary to the law as she correctly found in the first due process hearing.

Congress "commands the school district officials to construct a program in the least restrictive educational environment *appropriate to the needs of the child*."[131] Officer Skidmore reasoned the District school is the least restrictive environment for Q.M. to obtain a meaningful educational benefit because it provided Q.M. would be educated in the general classroom and the special education classroom. Officer Skidmore does not discuss Q.M.'s needs as part of her least restrictive environment analysis. We cannot determine the least restrictive environment without considering Q.M.'s individual needs for food security.

Hearing Officer Skidmore purports to consider Q.M.'s individual needs for food security. Officer Skidmore suggests Director Carroll and Endocrinologist Dr. Miller both agreed a student with Q.M.'s medical condition can be successful in a public school environment given certain restrictions.[132] We do not lightly question witness credibility evaluations. But Officer Skidmore's characterization of Director Carroll's and Endocrinologist Dr. Miller's testimony is

misleading. Director Carroll swore she is aware of public schools successfully accommodating students with Prader-Willi syndrome who have less severe manifestations than Q.M., *but not students with Q.M.'s level of severity.*[133] Endocrinologist Dr. Miller swore some children with Prader-Willi syndrome are educated in non-residential settings by controlling access to food, but she emphasized Prader-Willi syndrome is a spectrum disorder and swore she has never known a patient with Q.M.'s degree of severe manifestations of Prader-Willi syndrome be successfully educated in a public school environment.[134]

Officer Skidmore's failure to consider Q.M.'s individual needs does not comport with her position in the first due process hearing, where she recognized the District understandably offered Q.M. placement in a District school based on its obligations to provide the "least restrictive environment," but ultimately concluded Q.M. "requires a residential placement at this time in order to be provided with FAPE" based on his presentation.[135]

Officer Skidmore erred by not considering whether the District school is the least restrictive environment based on Q.M.'s individual needs for food security.

### 3. The Hearing Officer erred as a matter of law in denying tuition reimbursement based on Parents' subjective intent to keep Q.M. at Latham Centers.

Hearing Officer Skidmore reasoned even if she found the District's March 2022 IEP denied Q.M. a free appropriate publication, she would still bar tuition reimbursement entirely under the third prong of the *Burlington-Carter* analysis because "the Parents refused to execute a release as requested by the District, and clearly participated in the IEP process with the aim to maintain [Q.M.] at [Latham Centers]."[136] Hearing Officer Skidmore erred as a matter of law by focusing her analysis on Parents' subjective intent to keep Q.M. at Latham Centers.

Congress through the IDEA provides hearing officers may reduce or deny tuition reimbursement "upon a judicial finding of unreasonableness with respect to actions taken by the

parents."[137] Our Court of Appeals instructs "the reasonableness inquiry focuses not on the parents' subjective intent, but on their actual conduct and its consequences for the timely completion of the evaluation and IEP."[138]

Hearing Officer Skidmore pointed to Parents' subjective intent to keep Q.M. at Latham Centers as evidence they acted unreasonably. Officer Skidmore's analysis does not comport with our case law, which requires we consider whether Parents' conduct impeded the development of an appropriate IEP. Hearing Officer Skidmore does not explain how Parents' actions prevented the development of an appropriate IEP. Officer Skidmore reasons Parents' "limited cooperation in sharing information" bars tuition reimbursement, but she does not identify what information the Parents withheld and why the information is necessary for developing an appropriate IEP. Officer Skidmore's conclusion the March 2022 IEP is appropriate is at direct odds with a finding Parents' actions prevented the development of an appropriate IEP. Hearing Officer Skidmore must also consider the relative responsibility of both parties when making equitable determinations about the need for tuition reimbursement.[139]

### D.   We remand as we cannot meaningfully review Hearing Officer Skidmore's decision when we do not know the grounds on which it is based and as necessary to resolve errors of law.

Hearing Officer Skidmore did not sufficiently explain the basis for her decision and at times applied the wrong legal standard in her analysis. "[I]n the Third Circuit, remand is appropriate for clarification of the record and when a hearing officer applies the wrong legal standard."[140] We remand the matter to Hearing Officer Skidmore to fully examine and explain the basis for her conclusions consistent with the guidance in this opinion.

We are guided by Judge Salas's recent decision in *Livingston Board of Education v. D.A. & P.A.*[141] Judge Salas considered the hearing officer's conclusion the Livingston School District

denied student D.A. a free appropriate public education because it offered inadequate IEPs for both the 2014–2015 and 2015–2016 school years. After the hearing officer explained why she thought the 2014 IEP denied D.A. a free appropriate public education, she reasoned the school district also failed to offer D.A. a free appropriate public education through the 2015 IEP because it "offer[ed] more of the same" as the inadequate 2014 IEP.[142]

Judge Salas explained she could not conduct a meaningful review of the hearing officer's decision because the hearing officer did not provide adequate support for her conclusions and the decision "leaves more questions than answers."[143] Judge Salas explained the hearing officer's statement the 2015 IEP is inappropriate because it offers "more of the same" as the 2014 IEP  is inadequate because the two IEPs contain several differences and the hearing officer did not explain or reconcile the differences between the two IEPs in her decision.[144] Judge Salas reminded us "[i]t is not the Court's role to sift through the parties' conflicting interpretations of the evidence," and concluded "it is far more prudent to remand this matter so that the ALJ can provide fulsome explanations for her factual findings while utilizing her specific knowledge and experience."[145]

Hearing Officer Skidmore made similar errors as the hearing officer in *Livingston* because she did not explain the differences between the two IEPs she examined—the May 2021 IEP and the March 2022 IEP—or why those differences warranted different outcomes. We struggle like Judge Salas to fairly evaluate Hearing Officer Skidmore's decision without a fulsome explanation for her conclusions. We cannot affirm or reverse a decision when we do not know the basis on which it is founded.

Our Court of Appeals has long reasoned "prohibit[ing] the court from remanding for clarification would impair the court's ability to review the decision fairly."[146] We join a number

of our colleagues who exercised the remand power mindful we should not "substitute [our] own notions of sound educational policy for those of the school authorities which [we] review."[147]

We remand to the Hearing Officer to explain, consistent with her expertise and today's guidance, the reasons for her conclusion the March 2022 IEP denied Q.M. a free appropriate public education. Additional proceedings may be necessary to enable the Hearing Officer to fully assess the March 2022 IEP considering Q.M.'s individual food security needs. If Officer Skidmore comes to a different conclusion as to the appropriateness of the March 2022 IEP on remand, she must also consider and adequately explain whether Q.M.'s placement at Latham Centers is appropriate and whether Parents should be denied tuition reimbursement entirely.

### E.   We deny Parents' request for a stay-put Order as moot until further Order.

Parents seek an Order under the Act's "stay-put" provision requiring Q.M. remain at Latham Centers at the District's expense. The stay-put provision requires the District continue to pay for Q.M.'s "then-current educational placement" during the pendency of proceedings resolving placement disputes."[148] A stay-put order is an automatic injunction "designed to maintain the child's educational status quo while the parties' IEP dispute is being resolved."[149]

The District does not dispute Latham Centers is Q.M.'s current educational placement and represents it continues to fund 100% of Q.M.'s tuition at Latham Centers.[150] We do not see how this issue is disputed. The stay-put issue is not a justiciable controversy because there is no dispute over Q.M.'s pendency placement and Parents do not allege Q.M.'s placement or funding is at risk.[151] We deny Parents' motion for a stay-put Order.

## III.   Conclusion

Hearing Officer Skidmore found the District's March 2022 IEP offered Q.M. a free appropriate public education. The Hearing Officer did not explain the basis for her conclusion

particularly as it relates to her prior finding the May 2021 IEP denied Q.M. a free appropriate public education.

Officer Skidmore erred as a matter of law by (1) limiting the value of Endocrinologist Dr. Miller's opinion merely because she evaluated Q.M. after the District offered the March 2022 IEP, (2) not considering whether the District school is the least restrictive environment in light of Q.M.'s individual needs for food security, and (3) denying tuition reimbursement based on Parents' subjective intent to keep Q.M. at Latham Centers.

We remand to the Hearing Officer to apply the law consistent with our guidance and provide fulsome explanations for her conclusions utilizing her specific knowledge and expertise.

We deny both Motions for judgment on the administrative record. We deny Parents' Motion for a stay-put Order as moot since no party disputes the ongoing obligation.

---

[1] The parties filed the administrative record from the second due process proceeding at ECF No. 17. Hearing Officer Skidmore and the parties incorporated the record from the first due process proceeding. We will reference the record using the pagination assigned by the CM/ECF docketing system. We distinguish between the two proceedings using "QM I" when referring to the first due process (tenth grade) proceeding and "QM II" when referring to the second due process (eleventh grade) proceeding.

[2] *QM I*, ECF No. 10-11 at 1–227; 250–308; 310–449.

[3] *QM I*, ECF No. 10-10 at 147, 757, 778, 882, 934.

[4] *QM I*, ECF No. 10-8 at 49–52.

[5] *QM I*, ECF No. 10-7 at 113.

[6] *Id.*

[7] *Id*. at 128.

[8] *Prader-Willi Syndrome*, NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/genetics/condition/prader-willi-syndrome/.

[9] *QM I*, ECF No. 10-7 at 116.

[10] *Id.* at 118.

[11] *Is there a cure for Prader-Willi syndrome (PWS)?* NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT, https://www.nichd.nih.gov/health/topics/prader-willi/conditioninfo/cure.

[12] *What are the treatments for Prader-Willi syndrome (PWS)?* NATIONAL INSTITUTE OF CHILD HEALTH AND HUMAN DEVELOPMENT, https://www.nichd.nih.gov/health/topics/prader-willi/conditioninfo/treatments.

[13] *Id.*

[14] *QM I*, ECF No. 10-8 at 160–70, 207–08.

[15] *Id.* at 160–61.

[16] *Id.*

[17] *Id.* at 161–62.

[18] *QM I*, ECF No. 10-10 at 1.

[19] *Id.* at 588–658.

[20] *Id.* at 595.

[21] *Id.* at 750–872.

[22] *Id.* at 807–09, 811.

[23] *Id.* at 777.

[24] *Id.*

[25] *Id.* at 829–834.

[26] *Id.* at 945–46.

[27] *QM I*, ECF No. 10-7 at 10, 19–20, 38, 79–80, 87, 127.

[28] *Id.* at 19–20.

[29] *QM I*, ECF No. 10-10 at 1043.

[30] *Id.*

[31] *Id.* at 1045.

[32] *Id.* at 1030–32, 1034.

[33] *QM I*, ECF No. 10-7 at 24.

[34] *QM I*, ECF No. 10-11 at 625–27.

[35] *Id.*

[36] *QM I*, ECF No. 10-12.

[37] *Id.*

[38] *QM I*, ECF Nos. 10-6, 10-7, 10-8, 10-9.

[39] *QM I*, ECF No. 10-7 at 115, 119–22.

[40] *Id.* at 126.

[41] *Id.* at 132–33.

[42] *Id.* at 129.

[43] *QM I*, ECF No. 10-8 at 35, 40–43; ECF No. 10-11 at 450–612.

[44] *QM I*, ECF No. 10-8 at 29–34, 44–45; ECF No. 10-11 at 450–612.

[45] *QM I*, ECF No. 10-8 at 51.

[46] *QM I*, ECF No. 10-7 at 8.

[47] *Id.* at 41.

[48] *Id.* at 41, 52, 55.

[49] *Id.* at 100.

[50] *QM I*, ECF No. 10-3 at 23.

[51] *Id.*

[52] *QM I*, ECF No. 10-3.

[53] *Id.* at 29–30.

[54] *Id.* at 29.

[55] *Id.* at 29–30.

[56] *Id.* at 18, 21-22.

[57] *Id.* at 29–30.

[58] *Id.* at 31.

[59] *QM II*, ECF No. 17-6 at 17.

[60] *QM II*, ECF No. 17-9 at 28.

[61] *Id.* at 30.

[62] *Id.*

[63] *Id.* at 35.

[64] *Id.* at 34–35.

[65] *Id.* at 32.

[66] *Id.* at 36–40.

[67] *Id.* at 23.

[68] *QM II*, ECF No. 17-6 at 19–21.

[69] *Id.* at 19.

[70] *Id.* at 20.

[71] *QM II*, ECF No. 17-9 at 120.

[72] *QM II*, ECF No. 17-7 at 11–12.

[73] *QM II*, ECF No. 17-6 at 23.

[74] *Id.*

[75] *Id.*

[76] *Id.* at 19–20.

[77] *Id.*

[78] *Id.* at 23.

[79] *QM II*, ECF No. 17-9 at 120.

[80] *Id.* at 41.

[81] *Id.*

[82] *QM II*, ECF No. 17-6 at 24–25.

[83] *Id.* at 31.

[84] *QM II*, ECF No. 17-9 at 45–61.

[85] *QM I*, ECF No. 1.

[86] *QM II*, ECF No. 17-9 at 131.

[87] *Id.* at 92.

[88] *Id.* at 128

[89] *Id*. at 130.

[90] *Id.* at 90–92.

[91] *Id.* at 128.

[92] *Id*. at 120–22, 124.

[93] *Id.* at 131–145.

[94] *QM I*, ECF No. 7.

[95] *QM I*, ECF Nos. 38, 39.

[96] *QM I*, ECF Nos. 40, 43.

[97] *QM II*, ECF No. 17-6 at 5–6.

[98] *Id.* at 7–8.

[99] *Id.* at 9.

[100] *QM II*, ECF No. 17-7 at 28.

[101] *Id.* at 30.

[102] *Id.*

[103] *QM II*, ECF No. 17-6 at 31.

[104] *QM II*, ECF No. 17-3 at 16.

[105] *Id.*

[106] *Id.*

[107] *Id.* at 25–26.

[108] *Id.* at 22.

[109] *QM II*, ECF No. 17-5 at 3.

[110] *QM II*, ECF No. 17-3 at 22–23.

[111] *Id.* at 24–25.

[112] *Id.* at 24–25.

[113] *QM II*, ECF No. 1.

[114] The District is currently responsible for paying Q.M.'s tuition at Latham under "stay put" provision which provides unless the Parents and the District agree, the child shall remain in the ***then-current educational placement*** during the pendency of any disputes and until those disputes are resolved. 20 U.S.C. § 1415 (j). The "then-current educational placement" can be a placement ordered by an impartial hearing officer, state review officer, or judge. The school district must continue to pay for tuition throughout the due process proceedings. The school district may only stop paying if it reaches an agreement with parents on a new placement and/or services, or if a hearing officer, state review officer or judge issues a final decision indicating the current (pendency) placement is no longer appropriate.

[115] Congress provides through the Individuals with Disabilities Education Improvement Act, "[any] party aggrieved by the findings and decision" of the state administrative hearing officer

may bring suit in "any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). When reviewing the complaint, we "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); 20 U.S.C. § 1412(a)(1); *see also D.S.*, 602 F.3d at 556.

[116] *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15 (1993).

[117] *R.B. v. Downingtown Area Sch. Dist.*, 509 F. Supp. 3d 339, 352 (E.D. Pa. 2020) (*citing Carter*, 510 U.S. at 12–16; *Burlington*, 471 U.S. at 374. The *Burlington-Carter* test is named after two Supreme Court cases which together provide us with the three-step analysis to evaluate tuition reimbursement claims. *See Burlington*, 471 U.S. at 370; *Carter*, 510 U.S. at 15. In *Burlington*, the Supreme Court held Congress's grant of equitable authority in the IDEA empowers us "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Burlington*, 471 U.S. at 360. In *Carter*, the Supreme Court held if we find the District violated the IDEA we must then consider all relevant factors to determine whether private placement is appropriate and whether the equities weigh in favor of reimbursement. *Carter*, 510 U.S. at 15–16.

[118] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017).

[119] *Id.* at 394.

[120] *QM II*, ECF No. 17-3 at 2.

[121] *QM I*, ECF No. 10-3 at 29.

[122] *QM II*, ECF No. 17-3 at 22.

[123] *Id.* at 23.

[124] *QM I*, ECF No. 10-3 at 18, 21-22.

[125] *Id.* at 14.

[126] *QM II*, ECF No. 17-3 at 16.

[127] *See Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 762 (3d Cir. 1995) ("[W]e stress that such after-acquired evidence, such as information received through the experience of an alternative placement, should be used by courts only in assessing the reasonableness of the district's initial decisions regarding a particular IEP or the provision of special education services at all."); *T.M v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 812 (E.D. Pa. 2017) ("Evidence acquired

after the creation of the IEP is useful only to evaluate the reasonableness of the district's decisions at the time they were made."); *J.N. v. S. W. Sch. Dist.*, 55 F. Supp. 3d 589, 601 (M.D. Pa. 2014) ("Barring other reasons for exclusion, evidence acquired after an IEP—including information about a student's progress in an alternative setting—may be admitted to the extent that it bears on the appropriateness of that IEP when initially drafted."); *Colonial Sch. Dist. v. G.K. by & through A.K.*, No. 17-3377, 2018 WL 2010915, at *11 (E.D. Pa. Apr. 30, 2018), *aff'd*, 763 F. App'x 192 (3d Cir. 2019) ("This is not to say that evidence of occurrences after the IEP was made—including evidence of a student's progress—is irrelevant, but it can be used only to evaluate the reasonableness of the school district's decisions at the time they were made.").

[128] *QM I*, ECF No. 10-3 at 23.

[129] *Id.* at 30.

[130] *Id.* at 4, 18.

[131] *Carlisle Area Sch. v. Scott P. by & Through Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995) (emphasis added).

[132] *QM II*, ECF No. 17-3 at 24–25.

[133] *QM II*, ECF No. 17-7 at 30.

[134] *QM II*, ECF No. 17-6 at 9.

[135] *QM I*, ECF No. 10-3 at 29–30.

[136] *QM II*, ECF No. 17-3 at 24.

[137] 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

[138] *K. E. v. N. Highlands Reg'l Bd. of Educ.*, 840 F. App'x 705, 712 (3d Cir. 2020); *see also, Methacton Sch. Dist. v. D.W.*, No. 16-2582, 2017 WL 4518765, at *13 (E.D. Pa. Oct. 6, 2017) ("Parents' conduct can be described as one of 'vigorous advocacy,' not unreasonable conduct, and did not impede the School District's ability to craft an IEP, NOREP, or FAPE for the 2015-2016 school year. Consequently, equity does not support reducing or denying Parents' tuition reimbursement for Student's 2015-2016 school year."); *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 568 (D.N.J. 2007) (holding reimbursement inappropriate where parents "refused to cooperate with the [local education agency] to such an extent that the [agency] was unreasonably prevented from creating an IEP."); *Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 86 (3d Cir. 1999) (reversing decision denying full tuition reimbursement where "it is undisputed that the District failed to come forward with appropriate IEPs and there is no finding that the parents' conduct obstructed its ability to do so.").

[139] *See, C.G. v. Five Town Community School District*, which *C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 286 (1st Cir. 2008) (reasoning in situations where a parent's conduct frustrates the development of a final IEP, "the court should proceed to consider issues such as the way in which the IEP process unfolded and the relative responsibility of the participants for the breakdown of the process.").

[140] *Matthew B. v. Pleasant Valley Sch. Dist.*, No. 17-2380, 2019 WL 5692538, at *15 (M.D. Pa. Nov. 1, 2019); *see also Shane T. by & through Cathy K. v. Carbondale Area Sch. Dist.*, No. 16-964, 2017 WL 4314555, at *9 (M.D. Pa. Sept. 28, 2017) (remanding to hearing officer to make findings related to the second and third factor in the *Burlington-Carter* test); *Downingtown Area Sch. Dist. v. D.S. by & through C.S.*, No. 20-0892, 2022 WL 523563, at *13 (E.D. Pa. Feb. 22, 2022) (remanding to hearing officer to calculate compensatory education); *A.W. ex rel. H.W.*, No. 13-2379, 2015 WL 390864, at *18 ("Given the Hearing Officer's expertise in this subject, the court concludes that the Hearing Officer should address the issue of compensatory education in the first instance.").

[141] *Livingston Bd. of Educ. v. D.A. on behalf of D.A.*, No. 17-8802, 2021 WL 3706723, at *1 (D.N.J. Aug. 20, 2021).

[142] *Id.* at *7.

[143] *Id.* at *6-*8.

[144] *Id.* at *7.

[145] *Id.* at *8.

[146] *Carlisle Area Sch. v. Scott P. by & Through Bess P.*, 62 F.3d 520, 526 (3d Cir. 1995).

[147] *Rowley*, 458 U.S. at 206; *see, e.g., A.S. v. Colonial Sch. Dist.*, No. 19-2741, 2020 WL 6784350, at *7 (E.D. Pa. Nov. 18, 2020) (vacating and remanding matter to allow hearing officer to clarify the record where hearing officer drew inference based on evidence he chose not to admit); *F.H. v. W. Morris Reg'l High Sch. Bd. of Educ.*, No. 19-14465, 2020 WL 7223600, at *6 (D.N.J. Dec. 8, 2020) ("[T]his Court finds it appropriate to remand this matter to the ALJ so that it can address Plaintiffs' arguments that were not previously decided, and elaborate on the reasoning in support of its conclusions, particularly as to whether the District provided J.H. with a FAPE in the LRE and whether J.H. was properly classified."); *Shane T. by & through Cathy K. v. Carbondale Area Sch. Dist.*, No. 3:16-0964, 2017 WL 4314555, at *9 (M.D. Pa. Sept. 28, 2017) (remanding the matter "so that the Hearing Officer can make findings with respect to the second and third factor in the Burlington-Carter test.").

[148] *See* 20 U.S.C. § 1415(j); *Rena C. v. Colonial Sch. Dist.*, 890 F.3d 404, 415 (3d Cir. 2018).

[149] *De Paulino v. N.Y.C. Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020).

[150] *QM II*, ECF No. 13-2 at 9 ("Nonetheless, the District continues to fund 100% of Q.M.'s placement at Latham pursuant to IDEA's 'stay-put' provision, as required through the duration of this litigation.").

[151] *Mendez v. Banks*, 65 F.4th 56, 64 (2d Cir. 2023) ("[Section] 1415(j) does not create a procedural right to immediate payment, at least not absent a showing that a child's placement will be put at risk. In short, there has been no violation of Plaintiffs' rights, and thus no procedural injury, reparable or irreparable."); *Grullon v. Banks*, No. 23-5797, 2023 WL 6929542, at *5 (S.D.N.Y. Oct. 19, 2023) ("Only if DOE disputes pendency, which it has not done, will C.B. have a justiciable claim.").